IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF GEORGIA
GAINESVILLE DIVISION

DONNA SIDELL,                          :
                                       :
        Plaintiff,                     :
                                       :   CIVIL ACTION
v.                                     :   NO. 2:16-cv-176-RWS
                                       :
MEDMARK SERVICES INC. and              :
MEDMARK TREATMENT CENTERS :
OF GEORGIA, INC.,                      :
                                       :
        Defendants.                    :

## ORDER

This Fair Labor Standards Act ("FLSA") case comes before the court for consideration of a summary judgment motion [44] filed by defendants MedMark Services, Inc. and MedMark Treatment Centers of Georgia, Inc. (collectively "MedMark").  Plaintiff Donna Sidell has filed a response to defendants' motion, and defendants have timely replied.  The court will address this motion after reviewing the material facts in the case.

## I.    Factual and Procedural Background

This case arises out of plaintiff's employment.  Defendants MedMark operate a methadone clinic in Blairsville, Georgia, where plaintiff was employed. (Defs.' Statement of Material Facts ¶ 1, ECF No. 44-2.)  The Blairsville clinic is run by a Program Director and other managerial personnel. (*Id.* ¶ 9.)  At the time of

plaintiff's hiring, Christina Juarez served as Program Director at the Blairsville clinic. (*Id.* ¶ 9.) Jane Wade later served as an Interim Program Director from January to July 2015. (*Id.* ¶ 10.) From August 2015 through the end of plaintiff's tenure, Chantelle Patterson[1] stepped in as full-time Program Director. (*Id.*)

The clinic provides substance abuse treatment and counseling for its patients. (*Id.* ¶ 2.) Since methadone is a controlled substance, the clinic is subject to regulatory and security procedures. (*Id.* ¶ 3.) Under Georgia guidelines, for example, no counselor is to provide services to more than fifty patients. (*Id.* ¶ 4.) Counselors are required to have a one-hour session or two half-hour sessions per month with each of their fifty patients. (*Id.* ¶ 6.) Counselors exercise discretion in scheduling these sessions and, as a result, can see a varying number of patients on a given day. (*Id.* ¶ 7.)

Plaintiff was hired at the Blairsville clinic on June 2, 2014, as a counselor intern. (*Id.* ¶¶ 11, 13.) Counselor interns work as part of a program for individuals with experience or a family history of addiction and it allows them to obtain a substance abuse counseling certification after three years. (*Id.* ¶ 17.) Counselor interns are responsible for providing counseling services, drafting case summaries,

---

[1] The court has elected to use the spelling provided in plaintiff's response brief and the deposition transcripts rather than in defendants' motion for summary judgment.

drafting periodic treatment plans, and occasionally performing urine drug screens. (*Id.* ¶ 18.)   Counselor interns are supervised by certified counselors and appear to be subject to the same regulations with regard to patient interactions. (*Id.* ¶ 8.)

As a counselor intern, plaintiff was scheduled to work 5:00 a.m. to 1:30 p.m. with a half-hour lunch break from 10:00 a.m. to 10:30 a.m. (*Id.* ¶ 14.)   The Blairsville clinic operates during these same hours Monday through Friday and 6:00 a.m. to 10:00 a.m. on Saturdays. (*Id.* ¶ 15.)   Plaintiff was hired at a rate of $13.00 per hour and received a $0.10 per hour raise effective November 30, 2014. (*Id.* ¶ 16.) When she began work, plaintiff was a part-time employee and worked under forty hours per week. (*Id.* ¶¶ 20–21.)   Plaintiff became a full-time employee on July 13, 2014. (*Id.* ¶ 21.)

Per their employee handbook,[2] defendants contend that interns and other hourly employees are responsible for accurately reporting their own time—clocking in and clocking out. (*Id.* ¶¶ 19, 22–23.)   To record their time, employees use a computer time-keeping system called Exponent HR. (*Id.* ¶ 24.)   Plaintiff admits that the handbook references time-keeping procedures in theory, but she also contends that this procedure is not followed in practice. (Pl.'s Resp. to Defs.' Statement of Material

---

[2] Plaintiff received and acknowledged receipt of such a handbook upon her hiring on June 2, 2014. (*Id.* ¶¶ 28–30.)   As late as October 2015, she signed a similar attestation that she had read and understood the company's code of conduct and corporate compliance program. (*Id.* ¶ 63.)

Facts ¶ 25, ECF No. 54-2.)   She further claims that management at the clinic "implicitly" communicated—largely through the idea that defendants would not approve overtime—that employees were to clock in and out at designated times regardless of the time they actually arrived at or left work. (*Id.* ¶ 19.)  Plaintiff claims that both Wade and Patterson, in their capacities as directors of the clinic, instructed her to log work time consistent with this regime. (*Id.*)   Defendants rebut that employees, including plaintiff, are taught how to use the Exponent HR software and are trained on policies like overtime, timekeeping, and reporting issues to payroll. (Defs.' Statement of Material Facts ¶ 26.)

Among its policies, MedMark seems to prohibit employees from performing "off the clock work," which includes inaccurate reporting of time. (*Id.* ¶ 31.)  Policy violations are, at least in theory, subject to disciplinary action including termination. (*Id.*)  The policy states in relevant part that it is a violation of policy for

> any employee to falsify or alter his or her or another employee's time. It is also a serious violation of Company policy for any employee or manager to instruct another employee to incorrectly or falsely report hours.  If any manager or employee instructs you to: (1) incorrectly, or false under- or over- report your hours worked; or (2) alter another employee's time records to inaccurately or falsely report that employee's hours worked, you should report it immediately to your Supervisor or the Human Resources Department.

(*Id.* ¶ 33.)  The policy also states that "[i]n the unlikely event that there is an error in the amount of pay, the employee should promptly bring the discrepancy to the attention of your supervisor who should then contact the Payroll Department so that corrections can be made as quickly as possible." (*Id.* ¶ 35.)  Defendants claim that employees physically present in the building and working are required to be on the clock. (*Id.* ¶ 37.)

Plaintiff admits that she was aware of these policies as written and, to some extent, used them on some occasions. (*Id.* ¶ 41.)  In response, however, plaintiff also contends that she was permitted to work off the clock for most of the period she was employed with MedMark; that her managers knew she was doing so; and that she was never reprimanded or otherwise disciplined for this conduct. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 31.)  Likewise, plaintiff denies that she was required or even permitted to record her actual working time. (*Id.* ¶ 38.)  Rather, at one time or another, each of the three above-mentioned program directors and management generally instructed her to record time at designated intervals regardless of how long she actually worked. (*Id.* ¶ 42.)  On certain occasions, Chantelle Patterson even allegedly clocked plaintiff out without her consent. (*Id.*)  Jane Wade once allegedly told plaintiff that she had to clock in from 5:00 a.m. to 1:30 p.m. because MedMark would not approve overtime. (*Id.*)

MedMark maintains records of employee time entered into the Exponent HR and employee pay stubs, including those of plaintiff during her employment. (Defs.' Statement of Material Facts ¶¶ 44–45.) Those records show that plaintiff's pay, plus any overtime, matches exactly with the times she entered into Exponent HR. (*Id.* ¶ 46.) Defendants claim that plaintiff, on her own volition and without any direction or knowledge by supervisors, began coming in and leaving as much as a half hour to forty-five minutes earlier or later than her scheduled times. (*See id.* ¶¶ 47–48, 51.) They claim that she would remain at the clinic after her shift to handle personal matters when her internet was down or while waiting for her daughter to get out of school. (*Id.* ¶ 50.) Plaintiff claims that she would arrive early but not be able to clock in until 5:00 a.m. or sometimes later;[3] that she would often work through her lunch; and that she would regularly clock out at 1:30 p.m. and continue working until she left the building. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 48–49.)[4]

---

[3] The test for whether such preliminary or postliminary activities qualify for compensation is whether they are "integral and indispensable" to the principal work activity. *See Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1342 (11th Cir. 2007); *see also Integrity Staffing Sols. Inc. v. Busk*, 135 S. Ct. 513, 516 (2014). To the extent that plaintiff came in early for preliminary activities like making coffee, these activities are noncompensable under the FLSA. *See* 29 U.S.C. § 254(a)(2). However, preparing patient files or reviewing similar information like schedules and charts is a closer call.

[4] Plaintiff also makes an issue about attending certain meetings outside of work hours. It is not clear, however, if these meetings meet the standard for being involuntary or how much plaintiff intends to rely on them. *See* 29 C.F.R. § 782.28; *see also Price v. Tampa Elec. Co.*, 806 F.2d 1551 (11th Cir. 1987) (finding meter-reader training course not involuntary for merely providing opportunity for higher salary and was thus not compensable).

In short, plaintiff's claim is based on alleged time that went unrecorded. (Defs.' Statement of Material Fact ¶ 53.) Defendants claim that plaintiff never told anyone that she was not accurately recording her time and that no supervisor ever told her to incorrectly record time. (*Id.* ¶ 54.) Defendants claim that plaintiff has no records, documentation, witnesses, or evidence that she did not accurately record her time. (*Id.* ¶ 57.) Plaintiff counters that she has records for the date range of inaccurate reporting and that several individuals may serve as witnesses with personal knowledge of her reporting, including through her own direct testimony. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 57.)

These purported witnesses include Jacqueline Montreuil, Terry Hilton, and Jane Wade. (*Id.*) Jacqueline Montreuil, a fellow counselor intern, worked alongside plaintiff at the clinic for some period. (Pl.'s Statement of Additional Material Facts ¶ 1, ECF No. 54-1; *see also* Montreuil Dep. 8:17–24, ECF No. 47.) Montreuil's deposition testimony suggests that plaintiff did habitually work outside of her scheduled time[5] and that managers were aware of her doing so. (Pl.'s Statement of Additional Material Facts ¶¶ 10, 17–19.) Terry Hilton, a nurse at the clinic, also

---

[5] While testimony suggests that Montreuil was unable to verify with certainty what plaintiff was doing at these times, Montreuil did witness plaintiff at her desk, seemingly working, both before and after her scheduled work times. (Montreuil Dep. 51:1–24.) She also had reason to believe that managers also witnessed plaintiff at her desk. (*Id.* at 54:6–23, 57:5–21.) During her time at the clinic, Montreuil claims to have worked overtime without reporting as well. (*Id.* at 34:3–14.)

recognized an issue surrounding a forty-hour work limit per week but admits he was always paid for the time he worked. (Hilton Dep. 8:4–11, 21:2–25, 23:9–13, ECF No. 49.)  Jane Wade, who served as Interim Program Director for some period, echoed the understanding that clinic hourly employees were to fit their work into a forty-hour period and that overtime required pre-approval by a supervisor. (Wade Dep. 29:11–17, 48:14–17, ECF No. 48.)

Plaintiff seemingly never complained about inaccurate paystubs or timesheets using the procedure outlined in her handbook. (Defs.' Statement of Material Facts ¶¶ 58, 60.)  Plaintiff avers that she complained to Chantelle Patterson at least once about discrepancies in her pay, to which Patterson responded that no one could have more than forty hours logged in the system. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 58, 60.) Defendants argue that plaintiff knew how to report conduct she believed to be in violation of MedMark policy and that she even used this procedure to report Patterson for allegedly suspicious handling of medication. (Defs.' Statement of Material Facts ¶ 61.)  Plaintiff never used reporting procedures otherwise. (*Id.* ¶ 62.)  Defendants claim that the first time plaintiff notified anyone of

her off-the-clock work was after the termination of her employment at the clinic.[6] (*Id.* ¶ 64.)

Plaintiff was terminated on January 6, 2016. (*Id.* ¶¶ 11, 65.) Defendants claim that plaintiff was terminated for leaving out her personal medication and making it accessible to patients of the clinic. (*Id.* ¶ 66.) Another reason provided by defendants is that plaintiff deleted patient drug screens and hid personal relationships she had with patients outside of the clinic. (*Id.* ¶ 67.) Plaintiff claims that both of these reasons were pretextual and that, in truth, she was terminated for challenging defendants' practices with regard to timekeeping. (*Id.* ¶ 66.) Plaintiff was angry and worried about her financial situation after what she believes was an unfair termination by defendants. (*Id.* ¶¶ 68–69.) She filed this action on July 19, 2016, and amended her complaint on December 2, 2016. After a period for discovery, defendants filed the present motion for summary judgment on March 17, 2017. The court will now address that motion.

## II.  Legal Analysis

Federal Rule of Civil Procedure 56 provides that the court shall grant summary judgment if the movant can show "there is no genuine dispute as to any material fact" and "movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a).

---

[6] Plaintiff admits this fact but asserts that her managers knew of her off-the-clock work by way of her physical presence at the clinic outside of her scheduled hours. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 64.)

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   In reviewing a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing summary judgment. *See Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings" (e.g., by affidavits, depositions, interrogatory answers, or admissions) and designate specific facts showing a genuine issue for trial. *Fletcher v. Universal Tech. Inst., Inc.*, No. 6:05CV585 ORL31DAB, 2006 WL 2297041 (M.D. Fla. June 15, 2006) (citation omitted); *see also Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007) (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995)).   The evidence upon which the nonmoving party relies to avoid summary judgment must consist of more than "conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (citation omitted).

The FLSA prohibits employers from, *inter alia*, employing nonexempt employees for more than forty hours per week unless they receive time and a half compensation for hours in excess of forty. 29 U.S.C. § 207(a)(1); *see also id.* § 215(a)(2) ("[I]t shall be unlawful for any person . . . to violate any of the provisions of section 206 or section 207 . . . ."). To "employ" means to "suffer or permit to work." 29 U.S.C. § 203(g); *see also* 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time.").[7] The reason an employee works past standard hours is immaterial. 29 C.F.R. § 785.11. If an employer knows that the employee continues to work, even if not expressly authorized, that time is considered working time and is subject to compensation. *Id.*

A claim for unpaid overtime requires that an employee prove the following two elements: (1) he or she worked unpaid overtime and (2) his or her employer knew or should have known about it. *See Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) (citing *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306 (11th Cir. 2007)). The amount and extent of overtime work must be shown "as a matter of just and reasonable inference." *See Rance v. Rocksolid Granit USA, Inc.*,

---

[7] Courts have interpreted work to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Integrity Staffing Sols. Inc. v. Busk*, 135 S. Ct. 513, 516 (2014).

292 F. App'x 1, 3 (11th Cir. 2008).  The employer's knowledge can be established as either actual or constructive. *See Allen*, 495 F.3d at 1314–21.

In their motion, defendants MedMark make the following four points in favor of summary judgment: (1) plaintiff offers no evidence that defendants or any supervisor had actual or constructive knowledge of her alleged overtime; (2) plaintiff has no records and cannot show the amount or extent of her alleged overtime; (3) if the court finds otherwise on these first two issues, defendants should be protected against liquidated damages because they acted in good faith; and (4) defendant MedMark Services, Inc. was not plaintiff's employer. (Mem. in Supp. Defs.' Mot. for Summ. J., ECF No. 44-1.)  For the reasons that follow, this court finds that summary judgment is inappropriate.

A.    *Employer Knowledge*

As mentioned above, plaintiff must establish that defendants knew or should have known that she was working overtime.  Defendants primarily contend that she has not and cannot make that showing as an evidentiary matter. (Mem. in Supp. Defs.' Mot. for Summ. J. 12–20.)  First, plaintiff has not taken any supervisor depositions such to provide direct evidence of actual knowledge.  Second, she admits

that she never complained about overtime until after she was terminated.[8]  Third,

plaintiff admits to recording and being paid some minor overtime without disciplinary

action by defendants.  Fourth, supervisors did not know she came in early or left late

and, even if they did, no one asked nor understood her to be working during those

times.  Fifth, plaintiff would sometimes leave the clinic at a later time for reasons that

were not related to work.  Plaintiff responds that her supervisors did in fact have

knowledge because they routinely saw her working earlier and later than her

scheduled hours.  For example, Chantelle Patterson once clocked plaintiff out without

her consent and told plaintiff that she could not have more than forty hours.  Jane

Wade also witnessed plaintiff at the clinic outside normal business hours and even

noted uncompensated tasks in which plaintiff participated.

    Plaintiff may satisfy her burden either by showing that defendants actually

knew about her overtime work, which she appears to allege, or that they should have

known based on the circumstances.  *See Allen*, 495 F.3d at 1314–20 (discussing proof

by either actual and constructive knowledge); *see also id.* at 1321 ("[A]n employer

can be charged with constructive knowledge even when an employee has not alleged

---

[8] Plaintiff contends that complaining about overtime would not have changed anything
because her supervisors were already aware of the time she spent working.  From plaintiff's
perspective, any complaints lodged with or against Chantelle Patterson would have also directly
resulted in a more difficult workplace.  *See also Bailey*, 776 F.3d at 799 (finding that not following
accurate reporting procedures or complaining to employer was not a bar to employee's claim).

a supervisor's direct knowledge."). Unlike actual knowledge, constructive knowledge is measured by whether the employer had "the opportunity through reasonable diligence to acquire knowledge." *Reich v. Dept' of Conservation & Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (citation omitted) ("The cases must be rare where prohibited work can be done . . . and knowledge or consequences of knowledge avoided."). Knowledge by supervisors and management is typically imputed to the employer. *See Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827–28 (5th Cir. 1973); *see also Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015); *Reich*, 28 F.3d at 1083–84.

"An employer does not have knowledge of uncompensated overtime when an employee submits time sheets showing such overtime did not occur." *Fletcher v. Universal Tech. Inst., Inc.*, No. 6:05CV585 ORL31DAB, 2006 WL 2297041, at *5 (M.D. Fla. June 15, 2006) (citation omitted). However, this rationale does not apply in cases where supervisors encourage artificially low reporting or squelch truthful timekeeping. *See Bailey*, 776 F.3d at 801; *cf. Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324 (5th Cir. 1972) (precluding overtime claim where no evidence that employer knew or should have known). When an employer or its management attempt to suppress truthful reporting or encourage underreporting, they may no

14

longer disclaim knowledge. *Allen*, 495 F.3d at 1319 (citing *Brennan*, 482 F.2d 825); *see also Bailey*, 776 F.3d at 801 (noting same).

Employers and management also have a duty to exercise control of the workplace and to prevent undesired work from being performed. 29 C.F.R. § 783.13. ("[Employer] cannot sit back and accept benefits without compensating [employees]."); *see also Reich*, 28 F.3d at 1082 (discussing employer duty to inquire into conditions of work).  The mere promulgation of a rule against overtime work is not enough. *Reich*, 28 F.3d at 1083 (finding department had knowledge through complaints and reports); 29 C.F.R. § 783.13.  To avoid liability, they must make every effort to prevent employees from performing unauthorized work, which may include disciplining employees who violate its no-overtime work rule. *Reich*, 28 F.3d at 1083 (noting employer could have disciplined employees).

Courts have found numerous factual circumstances that denote an employer's knowledge of overtime work, including that (1) the employer was in a position to see the employee work, (2) work performed exceeded hours allotted, (3) there were repeated and numerous occasions of extra work, (4) there was a pattern or practice of employer acquiescence to the work, or (5) employees entered orders into a computer

prior to clocking in. *See, e.g.*, *id.* at 1081–84 (involving record inconsistencies for fish and wildlife officers who booked overtime during hunting season); *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 515 (5th Cir. 1969) (addressing employer in a position to see employee working overtime); *Maldonado v. Alta Healthcare Grp., Inc.*, 17 F. Supp. 3d 1181, 1193–94 (M.D. Fla. 2014) (noting employer could have discovered overtime with the exercise of diligence).  However, simply arriving at work is insufficient to impute knowledge that an employee is actually performing work. *See Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 270–71 (7th Cir. 2014); *see also Alvino v. Equinox Holdings, Inc.*, 629 F. App'x 847 (11th Cir. 2015) (affirming grant of summary judgment against plaintiff personal trainer because employer had no knowledge of overtime hours).

In this case, plaintiff not only alleges employer knowledge by way of supervisors' observing her at the clinic but also through their fostering an environment where employees are pressured to underreport hours worked. *See Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973) (noting the effect of supervisory pressure).  Defendants point to the fact that plaintiff's extra hours were on her own accord. *See Ekokotu v. Fed. Express Corp.*, 408 F. App'x 331, 340 (11th Cir. 2011) ("For [sic] uncompensated travel time claim, [plaintiff] has not demonstrated that any inadequate compensation was the result of

16

[the employer's] actions, rather than his own."). While this is a potentially valid point, it is also reasonable to believe that the tasks completed by plaintiff before her scheduled time were necessary to the proper functioning of the clinic or expected of her in the normal course of her work. For instance, it is possible that her coming in early allowed patient meetings to go more smoothly for everyone or that her finishing paperwork later in the afternoon was due to sheer volume rather than inefficiency. Plaintiff would need to suggest as much at trial. Thus, while perhaps not expressly authorized by the employer, these tasks reasonably provided a benefit to defendants' operation that they chose not to discourage or reject. *See* 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time."); *see also Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314–15.

Moreover, when an employer turns a blind eye to overtime needed to accomplish all job tasks, knowledge can be inferred. *See Fletcher*, No. 6:05CV585 ORL31DAB, 2006 WL 2297041, at *6 (noting that policy against unauthorized overtime and employees' struggling to get work done in time allotted created factual inference of deliberate ignorance). Here, it appears that all counselors at the clinic were booked to their capacity and that patients were lining up and ready to be seen many hours before the clinic opened. Moreover, the clinic is run out of a small office that requires people to pass plaintiff's office when entering or leaving the building.

17

(Montreuil Dep. 52:5–19.)  When reviewing her time sheets against the hours she could be observed in the office, at her computer or in the filing room, her supervisors likely obtained knowledge of her overtime hours.

Although defendants might contend otherwise, this case is unlike *Alvino v. Equinox Holdings, Inc.*, 629 F. App'x 847, 849–50 (11th Cir. 2015).  In *Alvino*, plaintiff was employed as a personal trainer at a fitness club. *Id.* at 848.  As part of her job, plaintiff worked full-time giving personal training sessions, conducting group classes, and doing floor shifts. *Id.* at 848.  She claimed to have spent extra hours in the club attempting to expand her client base as well. *Id.* at 848.  Off the clock, however, plaintiff—like many other trainers—also spent numerous hours in the club working out and socializing. *Id.* at 848–49.  The court found that it would not have been readily apparent to her supervisors that she continued working because personal trainers "lacked fixed schedules" and "were frequently present for purposes other than floor shifts." *Id.* at 849.

By contrast in this case, plaintiff worked a fixed scheduled and had little other reason to be at the clinic.  Short of the few examples presented by defendants, plaintiff's time at the clinic was almost entirely related to her job.  As such, it can be inferred that plaintiff spent those hours in excess of her scheduled time working and that, minus any time shown to be spent on personal matters, she is entitled to

compensation.  Consistent with the duty of managers to control the workplace, plaintiff's supervisors should have inquired further upon noticing her presence at the clinic both before and after her scheduled hours.  There is a genuine issue of material fact as to what plaintiff did during this time at the clinic and, if work-related, whether her supervisors knew or should have known such to include it in plaintiff's compensation or to instruct her against doing it any further.  A reasonable jury could find that defendants at least should have known that plaintiff was working uncompensated overtime on behalf of the clinic.  Whether they did in fact is a question for the same. *See Allen*, 495 F.3d at 1321 ("We believe that these arguments should be made to a jury.").

B.    *Employee Records*

Defendants argue next that plaintiff cannot meet her burden of showing the extent of her alleged overtime work.  Specifically, defendants argue that their records are accurate and that plaintiff's requested relief is speculative in nature. (Mem. in Supp. Defs.' Mot. for Summ. J. 20–22.)  Plaintiff counters that she has presented sufficient evidence for the calculation of overtime hours through daily arrival and departure estimates across the relevant time period of her employment at the clinic. (Pl.'s Resp. in Opp'n 17–20.)

As the first element of her claim, plaintiff must show that she worked overtime. *See Rance v. Rocksolid Granit USA, Inc.*, 292 F. App'x 1, 1 (11th Cir. 2008); *see also Gilson v. Indaglo, Inc.*, 581 F. App'x 832 (11th Cir. 2014) (affirming district court finding that employees failed to meet prima facie burden past a mere scintilla of evidence). Overtime may be established, and often is, through employer time sheets or other recorded evidence when available. Indeed, it is the employer's duty to keep such records. *See* 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. In some circumstances, however, for invidious reasons or not, employer records may not reflect all hours worked by a given employee. *See Bautista Hernandez v. Tadala's Nursery, Inc.*, 34 F. Supp. 3d 1229, 1241–42 (S.D. Fla. 2014); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) ("Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy.").

In these instances, an employee may meet his or her burden by showing "performed work for which he [or she] was improperly compensated" as well as "the amount and extent of that work as a matter of just and reasonable inference." *See Anderson*, 328 U.S. at 687 ("But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . . [, the solution]

is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work."); *see also Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting same). Given that employees rarely record their hours separately from the employer's system, evidence proffered in this fashion is typically less than exact. *Bautista Hernandez*, 34 F. Supp. 3d at 1241–42 ("Such [employee] evidence will frequently be anecdotal and imprecise, as employees seldom keep records regarding their own work.").

This is not, however, fatal to plaintiff's claim. *See id.* at 1242 ("Employees, therefore, may recover even though the amount may be uncertain and the damages difficult to calculate." (citation omitted)); *see also Washington v. Miller*, 721 F.2d 797, 803 (11th Cir. 1983) (finding farmwork employees met prima facie burden despite fact that their "[t]estimony as to the hours worked varied widely and was often confused and contradictory"); *Reeves v. Int'l Tel. & Tel. Corp.*, 616 F.2d 1342, 1352 (5th Cir. 1980) (permitting estimation of hours based upon "rough computations of [plaintiff's] subconscious mind"). An employee may recover by showing some evidence that, if taken to be true, allows for at least a rough calculation of damages.[9]

---

[9] Such a calculation would undoubtedly rely on defendants' records to account for holidays and other instances where it was impossible for plaintiff to have worked overtime.

In the present case, plaintiff has alleged unrecorded hours through rough time and date ranges.  If necessary, the court could engage in a calculation of approximate overtime based on these figures.  While defendants claim that their records are accurate, the extent of allegedly unrecorded hours partially calls that accuracy into question.  Defendants do not wholly dispute that plaintiff could be found in the office outside of her regularly scheduled time, as perhaps they cannot.  They do, however, challenge whether she was working during any of that time and point to the fact that she was responsible for keeping her own time.  Thus, similar to employer knowledge, the inaccuracy of defendants' records becomes an issue only if plaintiff can successfully show at trial that defendants knew of her extra work or pressured her to underreport in their system.  Plaintiff has shown as much for purposes of summary judgment.  Plaintiff has established through her testimony that working overtime required preapproval, that she believed unapproved overtime would not be paid, and that defendants would generally not approve overtime. (Pl.'s Statement of Additional Material Facts ¶¶ 37–40.)  Likewise, she testified in her deposition that supervisors instructed employees  to clock in and out at designated times regardless of the time they actually worked and that her supervisors were aware of the time she spent in the clinic. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 19.)  Defendants' motion on this issue is denied.

22

C.    *Good Faith*

Third, defendants assert the good faith defense to FLSA liability. Should FLSA violations be found at trial, they contend that they did not act willfully and thus should not be subject to liquidated damages in this action. (*See* Mem. in Supp. Defs.' Mot. for Summ. J. 22–24.)   Plaintiff argues that defendants had knowledge and accepted the benefit of her overtime work and should be precluded from asserting the good faith defense. (Pl.'s Resp. in Opp'n 20–22.)

A violation of § 207 of the FLSA allows an employee to recover "unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  An employer may avoid liquidated damages by showing that the violation was in good faith and that it had reasonable grounds to believe its actions were not a violation of the statute. *Id.* § 260; *see also Spires v. Ben Hill Cty.*, 980 F.2d 683, 689 (11th Cir. 1993) ("[L]iquidated damages are mandatory absent a showing of good faith.").  Yet this is a difficult showing. *See Bautista Hernandez v. Tadala's Nursey Inc.*, 34 F Supp. 3d 1229, 1241–42 (S.D. Fla. 2014) (describing burden of proof for good faith as "plain and substantial"); *Fletcher v. Universal Tech. Inst., Inc.*, No. 6:05CV585 ORL31DAB, 2006 WL 2297041, at *7 (M.D. Fla. June 15, 2006) ("[T]he burden is a difficult one, with double damages being the norm and single damages the exception." (citation omitted)).

23

Good faith has both an objective and a subjective component. *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991) (finding that employer failed good faith showing). Subjective good faith exists where the employer can show that it had an "honest intention" to ascertain what the FLSA requires and to act in accordance with it. *Id.* at 1566–67 (citation omitted). The objective component requires the employer to show that it had "reasonable grounds for believing that its conduct comported with the Act." *Id.* (citation omitted). But "even where the employer is able to establish both elements, any reduction or elimination of a liquidated damages award remains discretionary." *Bautista Hernandez*, 34 F. Supp. 3d at 1246 (citing 29 C.F.R. § 790.22(b)).

In the present case, the applicability of the good faith defense is largely dependent on the degree of knowledge presented at trial. Defendants claim that they had no knowledge of plaintiff's overtime. However, an employer may not rely on ignorance alone to establish good faith. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464 (5th Cir. 1979). Rather, the defense includes some duty to investigate potential liability under the FLSA. *Id.* at 468; *see also Washington v. Miller*, 721 F.2d 797, 804 (11th Cir. 1983). If such an investigation uncovers violations and the

employer fails to remedy them, that too precludes an employer from claiming the good faith defense as a matter of knowledge. *Spires v. Ben Hill Cty.*, 980 F.2d 683, 689 (11th Cir. 1993) ("An employer who knew or had reason to know that the FLSA applied, could not establish good faith as a defense.").

It is not clear from the record what, if anything, defendants did to investigate their compliance.  While the employee handbook contained information on overtime and accurate reporting, these policies, as a practical matter, do not appear to have been followed to the letter.  Nor were employees punished for violating these policies. Instead, plaintiff claims that defendants created an environment in the clinic where employees implicitly understood that reporting overtime—or, in plaintiff's case, the hours she appeared to work regularly—was not permitted. *See also Fletcher*, No. 6:05CV585 ORL31DAB, 2006 WL 2297041, at *7 (denying good faith defense where defendants attempted to "shield themselves from [overtime] knowledge" and created an "atmosphere where discussions of overtime work were "taboo").  That fact remains to be seen, but plaintiff should be allowed to proceed on her claim, and good faith may be decided at a later date.

D.   *Joint Employment*

As a fourth and final argument in their brief, defendants fleetingly suggest—without cited authority—that defendant MedMark Services, Inc. was not

one of plaintiff's employers.  They argue that MedMark Services, Inc. is merely the parent company of MedMark Treatment Centers of Georgia, Inc., which, they insist, was plaintiff's true and only employer.  Defendants then clarify that in case the court finds otherwise, it would like its previously stated arguments to apply to defendant MedMark Services, Inc.

In response, plaintiff points to the definition of employer under the FLSA and contends that "Courts have not looked to 'technical' common law concepts to define the scope of the employer–employee relationship" under the FLSA.  Plaintiff urges the court to consider "economic realities" of who or what hires and fires employees, sets the terms of employment, controls work, and pays wages. *See Goldberg v. Whitakter House Co-op, Inc.*, 366 U.S. 28, 33 (1961) ("*If* the 'economic reality' rather than 'technical concepts' is to be the test of employment, these homeworkers are employees." (internal citation omitted)).

Plaintiff points out that defendant MedMark Services, Inc. issued both her offer and termination letters; that it was responsible for promulgating her employee handbook and setting and altering the terms and conditions of her employment; and that all of plaintiff's time records were ultimately submitted for payment to defendant MedMark Services, Inc. at its headquarters in Texas.  Defendants do not rebut any of these contentions in their reply brief or statements of fact.  Both the full scope of

26

defendants' argument with regard to joint employment as well as whether they intended to abandon this argument remain unclear to the court.  As a result of this ambiguity, the court must now briefly address the argument on the merits.  *See United States v. Jackson*, No. 1:15-cr-00159-SCJ-JFK, 2016 WL 2742397, at \*3 (N.D. Ga. May 10, 2016) (noting that defendant had perhaps abandoned argument in reply brief but the magistrate judge nonetheless addressed its merits).

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  A "person" includes an "individual, partnership, association, corporation business trust, legal representative, or any organized group of persons." *Id.* § 203(a).  One employee may also have multiple employers, often known as "joint employment." *See* 29 C.F.R. § 791.2(a).  Courts have recognized joint employment in circumstances, *inter alia*, where "one employer is acting directly or indirectly in the interest of the other" or where "one employer controls, is controlled by, or is under common control with the other employer." *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012); 29 C.F.R. § 791.2(b); *see also Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996) (applying eight-factor test for joint employment).

27

Generally, the employer–employee relationship is one of economic dependence. For purposes of joint employment then, the focus of the inquiry is whether such a relationship exists with each purported employer. *See Layton*, 686 F.3d at 1177. To make this determination, courts have considered the following eight factors: (1) the nature and degree of control exercised by the employer, (2) the degree of supervision—direct or indirect—over work, (3) the right to hire, fire, or modify employment conditions, (4) the power to determine pay rate and method, (5) the preparation of payroll and payment of wages, (6) the ownership of facilities where work occurred, (7) whether work performed is integral to the overall business of the employer, and (8) the employee's relative investment in equipment and facilities. *See Antenor*, 88 F.3d at 932. No one factor is determinative, and varying weight may be given to each depending on the factual circumstances. *See Layton*, 686 F.3d at 1177–78.

In the present case, plaintiff points to salient facts in favor of finding defendants to be joint employers. First, correspondence for both her hiring and firing bear the name MedMark Services, Inc. (Pl.'s Statement of Additional Material Facts ¶¶ 48, 57.) Second, this same entity was responsible for setting policies for clinic employees and publishing the employee handbook, including a section on overtime. (*Id.* ¶¶ 58–59.) Third, MedMark Services, Inc. ultimately handled payroll for the

28

clinic and is admittedly the parent company of MedMark Treatment Centers of Georgia, Inc. (*Id.* ¶ 35.)  As a parent company of this and other clinics, it arguably exercises control over clinic operations as well. *See also* 29 C.F.R. § 791.2(b) (recognizing joint employment where one employer controls the other).  Defendants' reply brief is devoid of any arguments to the contrary.  Considering all of these factors in conjunction, the court finds that defendants may be considered joint employers.

The arguments that apply to both defendants are duly noted for purposes of this motion.  However, the court's rulings with respect to those arguments divest this issue of any significance.  Defendants' motion for summary judgment is denied.

## III.  Conclusion

In conclusion, defendants' motion for summary judgment [44] is hereby **DENIED**.  This case is hereby REFERRED to Magistrate J. Clay Fuller for mediation.

IT IS SO ORDERED, this 3rd day of August, 2017.

_____
**RICHARD W. STORY**
United States District Judge